L. Mr. Lorenzen for the Petitioner, Ms. Rylander for the Respondent, and Mr. Reed for the Intervener. Good morning, Your Honors. First, Thomas Lorenzen for the Petitioner, St. Paul Park Refining Company. This, I think, is a relatively straightforward case. And I want to cover just a few. We thought the other two. Oh, my gosh. Yeah, it's hard to follow that act. Nonetheless, let's talk about the few things that I want to cover here today. First, this case is not about whether the 2008 settlement agreement under which the Phase VI expansion surcharge was established is ambiguous and open to interpretation. The settlement agreement is clear. We don't dispute that. What the case is about is whether the circumstances surrounding the North Dakota pipeline have changed substantially or drastically since the time of the 2008 settlement and whether that, therefore, requires revisitation of the settlement to ensure that the Phase VI surcharge remains fair, reasonable, and in the public interest. And I think the critical things that the Court needs to attend to here are the maps on pages 7 and 8 of St. Paul Park's opening brief and on page 6 of FERC's brief. They show that the circumstances have, in fact, changed quite dramatically from 2008 conditions due to the North Dakota pipeline's 2013 Bakken expansion project. That substantially changed the system's configuration, and it did three things. First, it created a way for some shippers on the pipeline to escape the Phase VI surcharge, even when they used elements of the Phase VI expansion for which that surcharge was assessed. Second, it recreated a prior capacity problem on the line because the Western Edition's 164,000 barrel per day capacity cannot fully serve both the 210,000 barrel per day line to Clearbrook and the new 225,000 barrel per day beaver lodge loop that serves the Berthold rail facility and the Enbridge-Bakken line north to Canada. The fact... Before we get further on this, with respect to the loop project... Yes. So Mr. Reed's brief for the intervener says that this was not the focus of your complaint, that the focus of your complaint was the Berthold rail facility. And I must say, when looking at the complaint, that is what it looks like to me as well. And it was the focus of the complaint initially, but in the motion to dismiss that was filed by what was then Enbridge-North Dakota and is now North Dakota Pipeline, they specifically said, wait a minute, this isn't just the Berthold rail facility, this is part of this Bakken expansion program, which involved the opening of the Berthold rail facility, the construction of the beaver lodge loop, and... They're pleading. But is there a pleading of yours that you can point us to in the appendix in which you make the argument that you're making today that a significant amount of what would otherwise go to Clearbrook is going through the loop project and then back north? Is there a... Yes. If you actually look in the appendix, it's the document that begins at appendix page 338. It is the answer of St. Paul Park refining to the motion of Enbridge Pipelines-North Dakota for leave to file a reply to the answer, which is an awfully long document. Page 338? Page 338 of the appendix is where that starts. And if you look at that document... Which page, which sentence? I'm going to direct you to these sentences. It's actually a pretty short document in my joint appendix. It is. Hang on a second here. Yeah. Pardon me. Go ahead again. The reason I'm asking this, obviously, is that of the amount that you're saying is free riding, I'm going to use that just for purposes of your argument. I'm not sure I agree with it, but a lot of it is over this loop project. And if you didn't make that argument, then we can only focus on the parts that you did make. So if you could show me how you were making this... Well, I would refer you to page 338 and 339 of the appendix... Yes. ...where St. Paul Park says, Wait, I'm sorry. Just tell me the... ...SBPRC's complaint. Tell me the... Page 338? 338 and 339. Paragraph? It's paragraph 2. Uh-huh. And where does that sentence... Contrary to the motion of Enbridge, the answer of St. Paul Park to the motion to dismiss did not change the focus of SBPRC's complaint and its proceeding or advanced allegations not included in the original complaint.  And then we talk about in the next paragraphs the fact that shippers from five upstream origin points are using the classic system to reach Berthold. And what happens at Berthold... The next paragraph says that, in fact, the focus of the complaint is actually the diversion to Berthold, to the Berthold Rail Facility. Those are the words, right? It is there. But there is more to that. I mean, first of all, you have to understand that this is... No, this is... Before I learn to understand, you have to tell me which sentences I would be understanding. Because it does not look to me like the agency understood that you were making the argument that you're now making, because the chart that they have at the end of their order is really only a comparison of the rail facility, barrels per day to the Berthold Rail and the barrels per day to Clearbrook. And if they had understood it... So there's two possibilities, either that they completely misunderstood what you were saying and we should reverse them because they misunderstood, or that they did understand or that a reasonable agency would understand, in which case we can't hear that part of the argument. So help me with why the loop is really what we're talking about. Well, first of all, there are a number of things here that talk about... If you look at paragraph 5, the very next paragraph, the current motion of Enbridge introduces new unsupported factual allegations, creates new issues of material fact. In particular, it asserts that Phase VI expansion involved no improvements to the line running from Reserve and Granora. It goes on from there. But also it talks about in paragraph 8, about halfway through that, the 225,000 barrel per day beaver lodge loop that had been improved by the Phase VI expansion. So we're talking now about the beaver lodge loop. Paragraph 8 on page 341 of the appendix. I don't have page 341. Of the appendix? 341. We do have it. Okay. I apologize for that. What became clear during the dispute? I should say when the complaint was filed, we understood that there was a Berthold rail facility and there was a beaver lodge loop, which was the line, the pipeline that got you there. But what we understood was that the volumes were going off there. What we discovered through the motion to dismiss and what Enbridge said, which North Dakota Pipeline said, is that there was, in fact, another thing, that the majority of the volumes traveling over that line to Berthold were going to other places, up this Enbridge-Bakken line to Canada. Berthold is simply the destination for two different points of departure, one being the railhead, the other being the Enbridge-Bakken line. This came out through the course of the proceedings before FERC, and it is referred to in this portion of our answer. We think this is certainly enough to have raised a material question about what was going over this beaver lodge loop and where it was going in the volumes. And I note that also there is a statement in the affidavit of Mr. Steed that I think is very critical. It's on the appendix at page 288 where he says, The phasic surcharge is not applied to the shippers that deliver their crude oil into Berthold, either into the Bakken pipeline going north or the Berthold rail facility. So Enbridge raises this issue in their own factual submissions to FERC. Just tell me that again. I'm sorry. Page 288 of the appendix, it is the affidavit of Mr. Steed that was submitted to support the motion to dismiss. That was very illuminating to St. Paul Park, that there was a separate problem here, that it was not simply just the Berthold rail facility that was taking volumes off the line, but there was the whole second thing. There was this Enbridge-Bakken line that previously had been a southward flowing line. The direction of that was reversed by the Bakken expansion program. Now it actually takes volumes off to the north. I guess I can understand that you learned things during this. The question is, did FERC understand that you were not, I mean, the principal focus we have here seems to be on the loop. And that, is there some place where you then, after you learned what you learned during litigation below, you told FERC that, in fact, the real problem here, or a big part of the problem, is the loop? Well, I think that that is what we say in that last answer to the reply, to the answer to the reply, is that this is more than just about the rail facility. This is about the Beaver Lodge loop, which has a 225,000 barrel per day capacity. Remember that the rail facility, according to the map that was provided by North Dakota Pipeline, and that is reproduced in FERC's brief at, I believe, page 6, shows that the capacity of the rail facility was only 80,000 barrels per day. There's another 145,000 barrels per day that are going somewhere. Where are they going? North on this Enbridge-Bakken line that North Dakota Pipeline created as part of the Bakken expansion program. And what we contend here is that change to the system, this fundamental change in the configuration of the system, is a changed circumstance that justifies reexamination of the fairness and reasonability of these rates. What you've got now, and particularly if you look at the FERC map on page 6 of their brief, you can see that there is a constraint on the system at the western end of the system. Going into Beaver Lodge, the western edition of the phase 6 expansion has a capacity of 164,000 barrels per day. 37,000 barrels per day of one of the two lines in from, I can't remember if it's Renora or if it's from Alexander, and 127 from the other one. You add that up, you get 164,000 barrels per day. Up until the point of that phase of the Bakken expansion program, all of that western capacity, or almost all of that western capacity, served the North Dakota line through to Clearbrook, which has an overall capacity of 210,000 barrels per day. Suddenly you open this new line, the Beaver Lodge Loop, with its 225,000 barrel per day capacity. Well, just simple math tells you 164,000 barrels per day cannot fully serve both a 225,000 barrel per day new line and a 210,000 barrel per day line to Clearbrook. You've got a constraint on the system. And what we notice is that immediately upon the opening of that line, the surcharge assessed to shippers to Clearbrook quadrupled. It went from about $0.22 per gallon to $0.82 per gallon. When did it open? February 2013, March 2013, and the surcharge quadrupled immediately after that. So I'm looking at the appendix to the agency's order, which has this chart of barrels per day to Clearbrook, appendix 19. I'm sorry, page 19? Yeah. That's the appendix to the order, right? Yes, it is. So that shows the barrels per day to Clearbrook dropping well before, dropping significantly well before the date you mentioned, February 23rd, and actually rising at some point soon after the date you mentioned, not going down. It does start to rise. Absolutely it starts to rise. And the agency says that, so it's not clear that this is what's causing the problem. What's the answer to this? Well, it's not clear. I mean, that's one thing. First of all, it's not clear. Second is the volumes here, one of the things that is reported in this chart, is volumes to the Bertolt Rail Facility. There is nothing said here about volumes that are going on to this 145,000 barrel per day line, nor is it Canada. That's what I took to be there, not understanding that that was the argument you're making. Well, this chart is from North Dakota's own submissions. It's just reproduced from their briefs. They clearly understood they had a 225,000 barrel per day line. They brought it into the case by referring to the Bakken expansion program, by explaining what it was. But in any event, what explains the fact that it was dropping significantly before the date you mentioned and then starts rising? Well, it may well be. Well, we don't know. I mean, this is one of the things we wanted discovery about is what was going on here. North Dakota Pipeline says, look, the drop in volumes is due to the fact that some users may prefer rail now under then-present economic conditions to pipeline transportation because it's simply cheaper. Volume starts rising, but it never rises to the levels that North Dakota Pipeline assumed would be there, which was about 160,000 barrels per day. Also, when North Dakota Pipeline itself adds a rail facility, it exacerbates the problem because it creates another outlet for those volumes to go somewhere else that could have gone through to Clearbrook. Well, I guess what I'm asking is if I look at this chart, and your position is if nothing had happened after February 2013, that would be you wouldn't have a complaint, right? If February 2013 hadn't happened, then you wouldn't have any complaints. If they had not opened this new line. Absolutely. If volumes rise and fall and rates rise and fall. Yes. But so by that date, you were already at 96,038 barrels per day without any impact caused by the expansion. Well, that is clearly, you know, if volumes are rising and falling on that line through no fault of North Dakota Pipeline, through no intervention by them, that's on us. That's on St. Paul Park. That's why it makes no sense for FERC to say in their order, look, St. Paul Park didn't complain when rates rose and fell previously. Of course not. Because that was just normal market fluctuations. What happened in February and March 2013 is that the configuration of the system changed dramatically. A new line was open. Volumes could go elsewhere. Volumes are going elsewhere. They admit that at least 6.5% of the volume from Trenton and Alexander is going on to this new line. There is the additional question that even if the reductions in the volume are due to normal market fluctuations, these entities that are shipping over the Beaver Lodge Loop are using portions of the phase, of the Western edition of the Phase 6 expansion. They admit it. At least 6.5%. That's just from Trenton and Alexander. We don't know. They're using 6.5% of the expansion? Is that what you're saying? They say right in their pleadings, and I'll get you the quote. It is in Enbridge's reply to St. Paul Park's answer. It begins at appendix 325, but I'm going to refer you specifically to page 330. I believe you. I just wanted to get the number. Is 6.5%? Right, yes. The level of volume moving from Alexander and Trenton to Berthold is small, comprising less than 6.5% of total volume moving on the Enbridge and Aptico system. So you wouldn't have much of a claim about changed circumstances if you were restricted to that 6.5%, would you? Well, that only covers one of the two branches of the Western edition. There's a second branch from Granora that they do not address at all. If you look again at the map, you'll see that there are two branches of the Western edition that come into Beaver Lodge Loop. They only address the volumes of one. They don't mention at all what's happening on the other. Second, they don't mention what's happening with the 100,000-barrel tank that was installed at Beaver Lodge as part of the Phase VI expansion. And whether these shippers on the Beaver Lodge Loop are using that, certainly whether volumes are rising or falling on the Western edition, people who are using the Phase VI expansion or portions of it should be paying a portion of those costs. But instead, all falling on St. Paul Park and the other shippers through to Clarewood. Are those branches were part of the Phase VI expansion? There was additional capacity added to those as part of the Phase VI expansion. If you read again, let's see. I have the volumes in here. That's actually not in dispute that there was additional volume added to those things. Pardon me a second, and I will get you that portion of it. What about on JA-328, it says, the Phase VI expansion involved no improvements to the lines running from the reserve and Granora stations. Let me see. What the pleadings also say, appendix page 284, the Phase VI expansion added capacity of approximately 40,000 barrels per day of capacity into Minnow, North Dakota, from the western end of the pipeline system. You're on 284? 284. This is the affidavit of Mr. Steeve. And approximately 51,000 barrels per day of capacity from Minnow to the eastern end. So we're focusing on the 40,000 additional barrels of capacity into Minnow. We don't know exactly where all those changes were made. We know that additional pumping stations were upgraded. We know that drag-reducing agent facilities were added. We know that this 100,000-barrel tank was added at Beaver Lodge. All those things are portions of the western addition. And there is an admission here that the shippers on Beaver Lodge Loop are using portions of that western addition. We don't have full information. This is why we wanted discovery. There were clearly disputes of material fact here. And what we had was FERC essentially adopting the factual averments of the movement or dismissal or summary judgment rather than assuming that. But you didn't introduce any affidavits that countered them, right? We didn't have to because their own affidavits talk about this 145,000-barrel-per-day line north to Canada, the reversal of the direction of that line, the addition of the railhead, the addition of the Beaver Lodge Loop. That's from their own pleadings. We don't have to counter their own affidavits when they support us. They support the allegations in our complaint that volumes are being diverted from Clearbrook. So what was in dispute? Pardon? What was in dispute then? What is in dispute is, well, the essential question here is, is the addition of the Beaver Lodge Loop and the Bakken expansion a changed circumstance? But that's not a factual dispute. That's a judgment to be made based on the facts. Very good. Then the factual disputes, I get that question, Your Honor, are, first of all, how much of the volume is being diverted onto the Beaver Lodge Loop, whether it's destined for the Berthold Rail Facility or for the Enbridge-Bakken line? How much of the western addition of the Phase 6 expansion, the lines in from Granora and Alexander to Beaver Lodge Loop, as well as the 100,000-barrel tank at Beaver Lodge, are being used by those shippers? What percentage of the capacity, and therefore what percentage of the surcharge, should they be bearing in order to make this surcharge once again fair, reasonable, and in the public interest? That is the essence of the dispute. And that is why we think that for Erd— Is it a dispute, or you just would like some discovery on the question? Their position is it's small. Where's your evidence that it's big? Well, the very fact that it's there. It doesn't matter if it's small or big. It has to be a disputed fact, not just a fact you'd like to know about, right? Well, we know that they are using it. We know that there are volumes— That's not disputed. They agree that they're using it. But we don't know how much. And that is a disputed fact. It's not a disputed fact because you're not disputing it. I mean, if you wanted to say it was X amount and they wanted to say it's Y amount, you would have a dispute. But you're not disputing it. Isn't your argument really— I'm sorry. No, no. Isn't your argument, or I guess the point that— I don't want to put words in his mouth, but that Chief Judge Garland is making, is that your argument is really more akin to whether there was kind of a reasonable basis for them to conclude that the facts were as they thought that they were, as opposed to that there was a dispute. You see— I get your point, yes. And, you know, ultimately this does boil down to whether there are changed circumstances. Is there enough of a question here that volumes are leaving the system before a clear broke that otherwise might have gone there, and whether people are using the Phase VI expansion facilities without paying surcharge for them? There is a dispute as it is certainly clear that they are using portions of that system and that volumes are going up. That's not in dispute. It's admitted. What is in dispute or what remains to be discovered is how much volume is going off and how much of the Western addition to the Phase VI expansion are these shippers using. Those are the factual disputes that we think entitled St. Paul Park Refining Company to a hearing and to discovery to determine these things. You know, it's quite possible we'll find that they, in calculating how much volume was going to move through to Clearbrook for 2013 and 2014, took into account how much volume would be moving off the system onto the Weaver Lodge Loop. We don't know because we don't have access to those sorts of records of North Dakota Pipeline without discovery. Those are the things that we think we were entitled to and that we didn't get because FERC dismissed this without that chance. Okay. Thank you, Mr. Judge. Thank you. We'll hear, I think, from FERC now, right? Good morning. May it please the Court, Elizabeth Rylander for FERC. With me at counsel table is Stephen Reed and Glenn O'Reilly for interviewing the North Dakota Pipeline. Judge Garland, do you ask whether the Commission understood St. Paul Park's argument in resolving the complaint? Again, you have to lean in a little bit. Oh, I'm sorry, Your Honor. Is this better? Much better. Thank you. Many of the arguments that St. Paul made to this Court this morning were raised for the first time not in the complaint but in subsequent pleadings. And I think it is fair to say that what the Commission understood St. Paul Park's argument to be is that the exclusion of volumes to Berthold from the FASIC settlement surcharge is inconsistent with the intent of the settlement. The Commission found, and St. Paul Park does not dispute today, that the settlement is clear and unambiguous and that the intent really doesn't matter. The Commission also found no merit to St. Paul Park's argument that the surcharge application may unduly discriminate against clear book shippers. The Commission found that there was no evidence to support these allegations in its order. And while St. Paul Park requested discovery, because its allegations were unsubstantiated, the Commission found that it was not required to host a fishing expedition and to further investigate allegations that had no basis. Moreover, what St. Paul Park has asked the Commission to do is something exceptionally rare, which is to overturn an uncontested settlement. The Commission, as well as this Court, have spoken for the need for stability and predictability in contractual arrangements such as the settlement at issue here. The bar to overturning a settlement is very, very high. It requires a showing of changed circumstances that make the settlement no longer just and reasonable under the Interstate Commerce Act. The Commission reasonably found that in light of the lack of evidence, St. Paul Park had not supported its argument that the settlement was no longer just and reasonable and should no longer stand. If the Court has no further questions. I take it you would agree that if, say, St. Paul were the only remaining company that was shipping on that line because everybody else was going out at clear water, that that would be a substantially changed circumstance? Your Honor, the settlement is drafted in such a way that a single shipper could be responsible for the entire basic surcharge. So what would be a substantially changed circumstance? That is not clear from the record, and there are very few guideposts in previous Commission orders that would lead us to an answer to that question. But given what was presented to the Commission, the Commission reasonably found that there was no substantially changed circumstance here. The subsequent construction on the pipeline that was foreseeable to the parties in which St. Paul Park admits is foreseeable was not a substantially changed circumstance. The evidence that St. Paul Park discussed today, and I point specifically to appendix page 288 and appendix page 388, the arguments regarding draining volumes off of the classic line to the back end line was first raised not in the complaint but in subsequent pleadings. And, in fact, the arguments regarding the reversal of flow on the back end line were not presented to the Commission at all but only to this Court. So the Commission has not. Which ones were not at all presented? The reversing of the line? The contentions regarding the reversal of flow and the draining of volumes away from Clearbrook. That was first raised as far as at least where I can find it in petitioner brief. I'm sorry. Is that one argument or two? It's two interrelated arguments. As I understand St. Paul Park's argument, what they're saying is that when the direction of flow on the former portal line, which is now called the back end line, was changed, volumes were diverted from the classic system and taken by a circular route away from the classic system to Clearbrook by other means. Where is that going? It's going north toward Canada. Is there a refinery out there? No, Your Honor. There's additional pipeline capacity in Canada, so the back end line can take some volumes off of the classic system and north to Canada to join the Enbridge main line. So it goes essentially around a loop but still ends up at Clearbrook. But the arguments that this— But if it ends up in Clearbrook, does it not count? It's not that it doesn't count, Your Honor. Those volumes are not subject to the Phase VI surcharge. They are subject to the rate component of the back end line, applicable to the back end line that pays for the expansion of the system, that pays for that part of the expansion of the system. There's no way that I can see to avoid paying a surcharge for expansion of the system. It's just a question of which one you pay. No, I understand that. And this is merely a question of my not understanding the contract. But I thought it said everything that exits at Clearbrook is charged. Is that right? Yes, that's correct. So if it started to the west in this western addition area and ended up in Clearbrook through the circuitous method you were just describing, where it goes all the way north and then comes all the way south, would it be subject to the surcharge? I believe that would, because that would flow over the Beaver Lodge Loop, that that would be subject to the Beaver Lodge Loop expansion component of the rate. Even though in the end it exits at Clearbrook? Even though it goes to Clearbrook eventually. I would, however, suggest the Court ask that question to the intervener, who is probably better positioned to explain the details than I am. He's eager to get up here. But again, Your Honor, St. Paul Park has not raised some of these arguments before the Commission whatsoever. And these contentions about the effect of reversing flow of that particular line were not presented to the Commission at all. So the Commission certainly didn't understand that argument. The Commission never had an opportunity to consider it. So you think they were obligated then to file a petition to re-hear it? Is that the conclusion, or they just haven't exhausted their administrative remedies? This is a very odd jurisdictional situation we have here. Usually you have to file a re-hearing request for us to have jurisdiction, but this is under the ICA, so I guess you don't. Yes, Your Honor, I agree that it is a strange situation. I think if St. Paul Park had arguments concerning the effect of reversing that line, it should have raised them before the Commission in its complaint. But to any extent that it had difficulty with the latter two pleadings filed before the Commission that it discussed this morning, the Commission did not consider those or cite them in its order whatsoever. And if St. Paul Park had concerns with the Commission having made its decision in the apparent absence of considering those pleadings, then yes, it certainly should have filed a request for re-hearing. Further questions? Thank you. Thank you. We'll hear from Mr. Reed now. Thank you, Your Honor. Mr. Stephen Reed for North Dakota Pipeline as intervener. Let me start with the question which Ms. Rylander punted to me about why the surcharge does not apply to the volumes that go around this circuitous route to get to Clearbrook. It's because those pipelines going north out of Berthold and around into Canada are all separate companies. Those are not owned by or operated by North Dakota Pipeline, and so the settlement only covered North Dakota Pipeline. So it's only the deliveries by North Dakota Pipeline to Clearbrook that are covered by the Phase VI surcharge. I want to briefly really address three points, and I'll be very brief on the first one since Ms. Rylander I think already covered it. This is an extraordinary step that St. Paul Park is asking the court to take to overturn a court order upholding a previously approved settlement against the claim of changed circumstances. In fact, St. Paul Park cites no precedent from this court or any other court doing that act, and we were not able to find one either. I think there's enormous deference given to the commission's policy that settlements are sacrosanct in the absence of extraordinary changed circumstances, which the commission certainly did not find to be the case here. Secondly, there's been a lot of discussion about this, and I think it's clear from this argument that St. Paul Park has retooled its case from what it presented to the commission in its complaint to what it argued in its later pleadings to the commission and what it's arguing to the court of appeals here. And I think that is inconsistent with the doctrine of exhausting remedies. I think, first of all, if they had found things, as they allege, during the course of the case they thought were significant, they could have amended their complaint, raised those. We would have had a chance to answer, and the commission presumably have addressed those issues. That was not done. They could theoretically have sought rehearing, although it's not required. It is certainly available as an administrative remedy. If they thought there was something they had presented, the commission had an address. The commission doesn't make a point of this, but it is clear under the commission's rules they're only required to look at what's in the complaint. Rule 343.3C of the commission's rules specifically provides the commission can only take action on a complaint based on the issues in the complaint. So if St. Paul Park wanted to raise new issues, I think it was incumbent on them to exhaust the appropriate remedies to do that. The result of this change is that we're now faced with a case presented to this court that's based entirely on raw speculation about facts that are not in the record, many of which are incorrect. I'll just point out one that was represented this morning. There was nothing in the record to say that there was not an improvement to the Granora Reserve line as part of Phase 6, but we put in an affidavit of Mr. Steed, and it's cited in our brief at Appendix 329 to 330, specifically saying there were no improvements to the lines running from Reserve and Granora made during Phase 6. So any volumes moving over that line are not relevant to the Phase 6 surcharge at all. Similarly, there's an assertion in the briefs now, which was not present in the complaint and wasn't even argued to the commission below, that somehow the reversal of the line going north into Canada was a changed circumstance. But the record is pretty clear to the extent there is any record on this. When the commission considered that project in 2010, we issued an order approving it, and in that order it specifically recites that the line going north was closed in 2006, two years before the 2008 settlement. So there can't be a change in circumstance in the 2008 settlement based on something that happened in 2006. And lastly, this argument that they have advanced that what's really relevant here are the facilities west of Beaver Line. You said that that line that they say reversed direction is closed? It was closed in 2006. It was reopened as part of this project, Your Honor, to go north. But there was no oil flowing into Clearbrook from that line previously, so no flow was cut off that existed at the time of the settlement. And finally, they focus now on the portions of the Phase 6 facilities west of Beaver Lodge that allegedly feed into these two pipelines. But the fact is, at the time of the settlement, as is admitted in the pleadings, there was an upstream destination, which was Beaver Lodge. And so it was always possible that volumes would go to Beaver Lodge over some of these very modest facilities upstream that would not pay the Phase 6 surcharge. That was part of the settlement when it was approved. That's not a change if there are volumes doing that today. As we pointed out, and it was cited by counsel, the volumes going to the Berthold Rail Facility through those facilities were less than 6.5 percent of the total volume. That does not come anywhere close to matching the kinds of change circumstances that would be required to overcome the Commission's exercise of its discretion, in this case, not to hold a hearing. There were no disputed issues of material fact. This is simply a legal policy question that the Commission was entitled to resolve on the pleadings. Questions from the panel? Thank you, Mr. Reed. No time left, right? I'll give you another two minutes, as we said. Thank you. Thank you. Just very briefly, as Ms. Reilander said, FERC itself recognizes that these arguments that St. Paul Park raises here were in fact raised before FERC in the subsequent pleadings. She said that twice. What about the reversal of direction? The reversal of direction is something that was described by Enbridge, now the North Dakota Pipeline, in the affidavit of Mr. Steed and in their own motion to dismiss. And then did you make an update? The reversal of the line, if you're talking about the fact that it was closed previously? No, no. She said the reversal of the flow and what I'm describing as the circuitous route to Clearbrook were not presented to FERC at all. Well, the circuitous route to Clearbrook, I don't know if that was raised or not, but the reversal of the direction of the line, what we have here is a line that, as Mr. Reed said, was closed in 2006. It was not operating. After 2003, so it could not draw volumes away from Clearbrook before the 2013 expansion project, the Bakken expansion project. I think I understand the geography, which is actually, I feel pretty good about that. But my question is, did you argue specifically to the agency that that reopening the line, reversal of the line, et cetera, was itself a changed circumstance? Well, we argued that the fact that there was 225,000 barrels per day that could come off and only 80,000 barrels were going to Beaver Lodge Loop, the other 145 were going somewhere onto this line, is the only place it could go. We all have the maps. The maps were before FERC. You could see the directions of the line. In fact, if you look at the map that's in FERC's brief, which is just a reproduction of the map from North Dakota's brief before FERC, it shows 145,000 barrels heading up that line to Canada. As Mr. Reed said, the volumes that travel on that line up to Canada and back down to Clearbrook do not bear any of the Phase VI expansion surcharge. So that itself is a fundamental change in circumstances. Yes, there was a very small exit at Beaver Lodge before this 2013 Bakken expansion project. But as they say in their own pleadings and in the affidavit of Mr. Steele, the primary purpose of the Phase VI expansion project was to benefit shippers to Clearbrook. Once you reopen that line, change its direction, take volumes off at Beaver Lodge, you really can't say anymore that the primary purpose of that Phase VI expansion is to serve shippers to Clearbrook. It serves shippers to Beaver Lodge, and then some go to Clearbrook, some head northward. Those that are heading northward are getting the benefits of the western addition of the Phase VI expansion without paying any portion of the surcharge. What do you say about the footnote 2 of the settlement that says Enbridge reserves the right to propose a different plan for expansion? Yes, absolutely they have the right to expand. There's no question they have the right to expand. There are constraints on the system. And as production from the Bakken increases, there's going to be the need for additional pipeline service to various destinations. The problem was created not by just the construction of the Beaver Lodge loop with its 225,000 barrel per day capacity, but the fact that they didn't do a corresponding expansion of the western addition at the same time. That means you have a new constraint on the system. That's the changed circumstance. You can't fully serve both the Clearbrook shippers and the Beaver Lodge loop shippers from that western addition anymore because there is that constraint. 164,000 barrels per day remains the incoming capacity of those western additions. Further questions from the panel? Thank you to everyone. Thank you, Your Honor. I'll take the matter under submission.
judges: Garland, Wilkins, Randolph